**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re:<br><br>KIMBERLEY L. O'SULLIVAN<br><br>Debtor<br><br>MADGE K. CASPER<br><br>Plaintiff<br><br>v.<br><br>KIMBERLEY L. O'SULLIVAN<br><br>Defendant | Chapter 7<br>Case No. 18-10529-MSH<br><br><br><br><br>Adversary Proceeding<br>No. 18-01077-MSH |

**MEMORANDUM OF DECISION AND ORDER ON**
**ORAL MOTION OF DEFENDANT FOR JUDGMENT ON PARTIAL FINDINGS**

After the plaintiff in this adversary proceeding, Madge Casper, completed the presentation of her case in chief at the trial which began on March 4, 2020, on her complaint seeking a determination that her claim against the defendant and debtor in the main case, Kimberly O'Sullivan, is non-dischargeable, Ms. O'Sullivan made an oral motion for judgment in her favor on the basis that Ms. Casper had failed to carry her burden of proof as to non-dischargeability under Bankruptcy Code § 523(a)(2)(A).[1]

The following are my findings of fact and rulings of law on this motion, which I will treat as a motion under Rule 7052(c) of the Federal Rules of Bankruptcy Procedure for judgment on partial findings. I base my findings on the evidentiary record and the submissions and arguments

---

[1] All references to the Bankruptcy Code are to 11 U.S.C. §§ 101-1532.

1

of the parties. In considering the testimony at trial, I relied exclusively on my first-hand observation of the witnesses reinforced where necessary by re-listening to their testimony in the audio recording of the trial. I did not review the written trial transcript which Ms. Casper claims contains errors. *See* May 27, 2020 Order, ECF No. 108.

In or prior to October of 2008, Ms. O'Sullivan approached Ms. Casper, an attorney, about Ms. Casper's representing her in her divorce proceeding pending in the Massachusetts probate and family court. At the time Ms. O'Sullivan was represented by counsel but wanted Ms. Casper to replace him. Ms. Casper was well-acquainted with Ms. O'Sullivan, who conducted a plastic surgery practice in Wellesley and had treated both Ms. Casper and her law partner and husband, Joseph Casper. In fact, the Caspers credited Ms. O'Sullivan with saving Mr. Casper's life by diagnosing (when other physicians had not) and successfully removing a cancerous growth from Mr. Casper's arm. The Caspers held Ms. O'Sullivan in the highest esteem.

At a meeting in Ms. Casper's law office in early October 2008, Ms. Casper told Ms. O'Sullivan she could not represent her until she discharged her then attorney. Ms. Casper gave Ms. O'Sullivan a fee agreement which was dated October 6, 2008, and explained its terms to her. The agreement provided that Ms. O'Sullivan would pay Ms. Casper at a fixed hourly rate for her services plus reimburse her for necessary expenses within 30 days of receipt of a bill. Bills would be sent on a regular basis. Also, the agreement called for Ms. O'Sullivan to pay Ms. Casper a retainer of $5000. Ms. O'Sullivan left the meeting with the unsigned fee agreement. Ms. Casper didn't hear from Ms. O'Sullivan again until December 2008 (by which time, presumably, Ms. O'Sullivan had discharged her other attorney) when she received in the mail the signed fee agreement along with the $5000 retainer.

The next month, in January of 2009, before Ms. Casper had sent Ms. O'Sullivan any bills, Ms. O'Sullivan asked Ms. Casper for a change in their billing arrangement. Rather than receiving and paying bills on an ongoing basis as provided for in their signed fee agreement, Ms. O'Sullivan asked Ms. Casper if she would agree not to send her periodic bills but rather to bill her all at once at the conclusion of her divorce case. This is a highly unusual billing arrangement for obvious reasons. Nevertheless, Ms. Casper agreed. Her decision was motivated to a significant degree by her gratitude toward Ms. O'Sullivan for saving her husband's life.

Thus, in January 2009, the parties reached an oral agreement to amend the 2008 fee agreement so that Ms. O'Sullivan would no longer receive periodic bills for Ms. Casper's legal services and as a result all fees would accrue and be payable in full at the end of the divorce case. Periodic bills for out of pocket costs and expenses would continue to be sent to Ms. O'Sullivan who remained obligated to pay them under the original fee agreement.

On July 19, 2011, as the date for the divorce trial and, based on their fee agreement, the date for a lump sum fee payment, neared, Mr. Casper had a conversation with Ms. O'Sullivan. Mr. Casper reminded her that once the divorce trial concluded she would be required to pay all legal fees that had been accruing over the past two-and-a-half years. He told her that total fees incurred to date, after a substantial courtesy discount, were $70,000. He suggested Ms. O'Sullivan begin planning for this payment. He offered her the option of paying in a lump sum or in installments. Ms. O'Sullivan registered no protest to anything Mr. Casper said but asked for some time to think about how she would like to pay the eventual legal bill. Shortly thereafter, Ms. O'Sullivan informed Mr. Casper that she preferred to pay the legal fee in installments of $2000 per month beginning in November 2011. The parties were assuming that the divorce trial would begin in August 2011 as scheduled by the probate and family court and would be

3

concluded in one day. That would give Ms. O'Sullivan time to get her affairs in order before her first installment payment to Ms. Casper came due.

On August 9, 2011, Ms. O'Sullivan came to the Caspers' law office presumably to prepare for the divorce trial which was to take place the next day. At their meeting the Caspers presented Ms. O'Sullivan with a one-page document entitled "Agreement for Payment of Legal Fees" which contained the terms of the payment arrangement Ms. O'Sullivan had requested in her prior conversation with Mr. Casper, namely that she would pay the total fees for her divorce case (which as of that date totaled $70,000) in monthly installments of $2000 each beginning on November 1, 2011. I find that Ms. O'Sullivan raised no objection to the agreement (after all, it memorialized terms she herself had requested). I do not credit her testimony that she signed the payment agreement under duress or that she was presented with the agreement, the terms of which she was completely unaware, with an ultimatum by Ms. Casper on the eve of trial that unless she signed then and there Ms. Casper would withdraw as her attorney.

On the contrary, I find that if anyone's conduct in connection with the payment agreement and the events leading up to its execution on August 9, 2011, was inappropriate it was Ms. O'Sullivan's.

During the year prior to the negotiation and execution of the payment agreement, Ms. O'Sullivan had lost her hospital privileges to perform surgical procedures. At the time she had privileges at Newton-Wellesley, Beth Israel–Needham and Faulkner Hospitals. All privileges were terminated in 2010. These terminations triggered the initiation in 2010 of an administrative proceeding by the state medical licensing board to determine whether Ms. O'Sullivan's medical license should be suspended or revoked. Ms. O'Sullivan actively defended herself in the administrative proceeding and in fact was successful in September of 2011 in obtaining an order

4

from the medical licensing board requiring Beth Israel–Needham to reinstate her privileges. Reinstatement was short-lived, however, ultimately being revoked once and for all in 2012. Ultimately, Ms. O'Sullivan lost her license to practice medicine in Massachusetts.

The upshot of all this was that in July and August of 2011, when Ms. O'Sullivan was in active discussions with the Caspers about the payment of her substantial legal bill and on the eve of her divorce trial, her medical practice was in existential jeopardy. Her ability to generate the level of income she had generated in years' prior was in serious question.

At the trial, Ms. O'Sullivan testified that she had made Ms. Casper aware of her hospital privilege and medical licensing troubles repeatedly as they were happening and that in July and August of 2011 Ms. Casper was fully aware of her professional and financial situation. I find Ms. O'Sullivan's testimony on this subject to have been false. I find that she concealed this information from the Caspers who only found out about Ms. O'Sullivan's hospital privilege and licensing troubles on November 1, 2011 by chance when Ms. O'Sullivan asked Ms. Casper to seek a postponement of a divorce hearing as Ms. O'Sullivan couldn't be there because she had to be at a medical licensing board hearing the same day.

I find that Ms. O'Sullivan concealed her professional troubles from everyone involved in her divorce case because she feared that if they came to light she might lose custody of her children. Thus, at a deposition conducted by her husband's attorney on April 20, 2011, she falsely testified that she was then working 40 to 60 hours per week between hospital and office visits when at that time she had no hospital privileges anywhere. She compounded that falsehood at a subsequent deposition on July 19, 2011, when in response to a question testified that her medical practice responsibilities remained unchanged since her testimony in April. Mr. Casper, who accompanied Ms. O'Sullivan to both depositions, would have had every reason to assume

5

that her medical practice was stable when after the July 19th deposition he spoke to her about how she planned to pay her lump sum legal fee after the divorce trial.

Ms. O'Sullivan's divorce trial ended up taking more than the single day in August that had originally been scheduled. The trial extended over 4 days and finally concluded in January of 2012. Ms. O'Sullivan was unhappy with the result. She paid a total of $1200 in late and partial payments under the fee agreement with Ms. Casper and then stopped paying altogether. When Ms. Casper pressed her for payment Ms. O'Sullivan filed a disciplinary complaint against Ms. Casper with the Massachusetts Board of Bar Overseers. The complaint was ultimately dismissed. Ms. Casper sued Ms. O'Sullivan in state court to collect her unpaid fees. On February 16, 2018, Ms. O'Sullivan filed her bankruptcy petition in this court. On her schedule of liabilities accompanying her petition she listed Ms. Casper as a creditor with a disputed claim in the amount of $155,897.

As indicated at the outset, Ms. Casper seeks a judgment against Ms. O'Sullivan that her claim against Ms. O'Sullivan arising out of the 2011 Agreement for Payment of Legal Services and the 2008 fee agreement are non-dischargeable under Bankruptcy Code § 523(a)(2)(A).[2] This provision excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11. U.S.C. § 523(a)(2)(A).

As the U.S. Court of Appeals for the First Circuit recently noted in *Stewart v. Stewart (In re Stewart)*, 948 F.3d 509, 520 (1st Cir. 2020), in keeping with the Bankruptcy Code's fresh start policy, exceptions to discharge must be narrowly construed and, for that reason, a creditor

---

[2] Ms. Casper's separate claim for non-dischargeability under § 523(a)(2)(B) was previously resolved in Ms. O'Sullivan's favor on summary judgment (ECF No. 66).

6

seeking to exclude a debt from discharge must show that her claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a). Thus Ms. Casper bears a heavy burden here.

In *Stewart*, the First Circuit reprised the well-established six-part test (the so-called *Palmacci* test) for making out a claim under § 523(a)(2)(A). *See Stewart*, 948 F.3d at 520 (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st Cir. 1997)). Specifically as to a false representation claim under § 523(a)(2)(A),

> the plaintiff must prove by a preponderance of the evidence that:
> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth,
> 2) the debtor intended to deceive,
> 3) the debtor intended to induce the creditor to rely upon the false statement,
> 4) the creditor actually relied upon the false statement,
> 5) the creditor's reliance was justifiable, and
> 6) the reliance upon the false statement caused damage.

*Stewart v. Stewart (In re Stewart)*, 948 F.3d 509, 520 (1st Cir. 2020) (quoting *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 66 (1st Cir. 2012)) (formatting altered). The *Stewart* court noted that while a claim for false pretenses is a separate and distinct category under § 523(a)(2)(A), the requirements are largely the same, except that the requirement of a false representation is replaced by a requirement of a false pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor. *Id.* Each of the six elements requires a separate finding of fact, and the failure to prove any one of them will be fatal to a plaintiff's case.

Based on the facts here, I conclude that Ms. O'Sullivan knowingly failed to disclose to Ms. Casper her loss of hospital privileges and the initiation of an administrative proceeding concerning her license to practice medicine in Massachusetts prior to entering into the August 9, 2011 Agreement for Payment of Legal Services. In other words, Ms. O'Sullivan knowingly entered into the agreement under false pretenses. I also conclude that in doing so Ms. O'Sullivan intended to deceive Ms. Casper and intended to induce Ms. Casper into entering into the

7

agreement which would allow her to pay her legal bills over an extended time in installments. Thus, Ms. Casper has carried her burden on the first three *Palmacci* factors.

She falters, however, on the fourth—actual reliance. While Ms. Casper claimed in her complaint and at oral argument that she would never have agreed to the August 2011 installment payment plan or to continue to represent Ms. O'Sullivan on the basis of the January 2009 fee deal whereby she would not expect any payment until the conclusion of the divorce trial, had she known of Ms. O'Sullivan's precarious financial and professional situation, the evidence presented at trial proves otherwise.

Ms. Casper testified repeatedly about her and Mr. Casper's special relationship with Ms. O'Sullivan and their gratitude toward her for saving Mr. Casper's life. Ms. Casper testified more than once that even after learning of Ms. O'Sullivan's professional troubles in November of 2011, she was willing "to work with her." Mr. Casper testified that he and Ms. Casper never talked about withdrawing as Ms. O'Sullivan's attorneys at any time including after November 1, 2011, when they first learned of Ms. O'Sullivan's professional troubles. And indeed they did continue to represent her until the following June. In her trial testimony Ms. Casper talked about her belief that it was her professional and ethical duty **not** to abandon Ms. O'Sullivan even after learning of her financial difficulties. The Caspers' integrity is, ironically, their undoing.

Ms. Casper had the burden to prove that she relied on the conduct of Ms. O'Sullivan which gave rise to Ms. Casper's section 523(a)(2)(A) claim. In the context of a claim of false pretenses, that is the withholding of material information, Ms. Casper needed to prove that had Ms. O'Sullivan disclosed the material information she was concealing, namely her professional troubles, in July and August 2011, Ms. Casper could have avoided the financial harm she ultimately suffered.  No evidence submitted in the course of Ms. Casper's case in chief supports

that claim and, as indicated above, if anything, the testimony of both Ms. Casper and Mr. Casper suggests that had Ms. O'Sullivan told them about her troubles as they occurred, they would have continued to represent her and "worked things out."

For these reasons, defendant's oral motion for judgment is hereby GRANTED. A separate judgment on the complaint shall enter in favor of the defendant.

I want to be clear that my ruling should not be taken as vindicating Ms. O'Sullivan's conduct vis-à-vis the Caspers. Her behavior has done her no credit. But Congress and our Circuit Court of Appeals have set a very high bar for transforming reprehensible behavior into a non-dischargeable debt. It is difficult enough to surmount that bar when the dispute arises in the rough-and-tumble of everyday commerce.[3] When the parties are a lawyer and her client the climb gets even tougher. That's because the practice of law is not just a vocation, it is the fulfilling of a public trust. This case is an embodiment of that distinction.

Dated: June 19, 2020

By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   Madge K. Casper
Dover, MA
acting *pro se*

Ira H. Grolman
Grolman LLP
Boston, MA
for the defendant, Kimberley L. O'Sullivan

---

[3] Paraphrasing from the writings of the eminent Massachusetts Appeals Court Associate Justice, Rudolph Kass